## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERI A. DUPONT, ET AL. | * | CIVIL ACTION NO.: |
| | * | |
| Plaintiffs, | * | JUDGE: |
| | * | |
| VERSUS | * | MAGISTRATE: |
| | * | |
| EXXON MOBIL CORPORATION, ET AL. | * | **JURY REQUESTED** |
| | * | |
| Defendants. | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | * | |

### NOTICE OF REMOVAL

Defendants, Exxon Mobil Corporation ("EMC") and ExxonMobil Pipeline Company, LLC ("EMPC") (collectively, "ExxonMobil"), with a full reservation of rights, defenses, objections, and exceptions, hereby remove this action from the 19th Judicial District Court, East Baton Rouge Parish, Louisiana, to the United States District Court for the Middle District of Louisiana, pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1442. In support of removal, ExxonMobil avers as follows:

### I.     INTRODUCTION

On September 29, 2025, ExxonMobil received Plaintiffs' designated experts' reports, which revealed for the first time that Plaintiffs' claims implicate operations and activities occurring at EMC's Baton Rouge, Louisiana refinery facility (the "Baton Rouge Refinery") that were, during the timeframe that they occurred, subject to extensive and exclusive federal direction, control, and regulation. It is now clear that Plaintiffs' claims implicate wartime and national emergency activities undertaken at the direction of federal officers. For this reason, ExxonMobil respectfully removes this case pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1442.

1

## II.    BRIEF BACKGROUND / SUMMARY OF GROUNDS FOR REMOVAL

The removed lawsuit involves claims for personal injuries and property damage allegedly connected to ExxonMobil's operation of the Melville Pumping Station in Melville, St. Landry Parish, Louisiana in the early 20th century. The Melville Pumping Station was a crude oil pumping station that operated from approximately 1912 to 1952 in support of the trunkline that transported crude oil to the Anchorage terminal in Baton Rouge, Louisiana. Plaintiffs are residents of and neighbors to the Standard Heights Subdivision, located on the former Melville Pumping Station property. Plaintiffs, in their amended Petition, allege that the operation of the Melville Pumping Station resulted in contamination of the subject property and Plaintiffs' exposure to said contamination.

Since the lawsuit's inception, Plaintiffs' claims and allegations have centered exclusively on the operations of the Melville Pumping Station and the trunkline that the Melville Pumping Station serviced during its operation. However, on September 29, 2025, Plaintiffs produced expert reports to ExxonMobil, including the report of Professional Geoscientist and Engineer Richard C. Bost of Astra-I2M, L.L.C. (the "Bost Report").[1] In the Bost Report, for the first time, Plaintiffs make clear that their claims implicate not only operations at the Melville Pumping Station, but also operations at the Baton Rouge Refinery. The Bost Report alleges that the operations at the Melville Pumping Station and trunkline are "inseparable" from operations at the Baton Rouge Refinery, and that both the Melville Pumping Station and the trunkline were operated as "arms" of the Baton Rouge Refinery.[2] The operations at the Baton Rouge Refinery implicated by Plaintiffs' claims encompass operations during the United States' involvement in both World War II (1941-

---

[1] A true and correct copy of the Bost Report, as produced to ExxonMobil, is attached hereto as **Exhibit 1**.
[2] **Exhibit 1**, Bost Report, at pp. 29-30.

1945) and the Korean War (1950-1953), during which times operations at the Baton Rouge Refinery were directed and controlled by the federal government.

Accordingly, the Bost Report reveals to ExxonMobil, for the first time, that the Plaintiffs' claims challenge federally directed and controlled activities, thereby giving rise to jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442.

## III.     REMOVAL IS PROPER

Plaintiffs' new theory that Melville Pumping Station operations and related pipelines were an "arm" of the Baton Rouge Refinery and were "inseparable" from the operations at the Baton Rouge Refinery, reveal federal officer jurisdictional grounds that were not "affirmatively revealed on the face" of Plaintiffs' initial pleadings (which made no mention of any connection between the operations at the Melville Pumping Station and Baton Rouge Refinery).[3] Accordingly, and for the reasons set forth following, ExxonMobil removes this case on the grounds of federal officer jurisdiction under 28 U.S.C. § 1442.

### a.     This Court has subject matter jurisdiction pursuant to Federal Officer Jurisdiction, 28 U.S.C. § 1442.

The Bost Report reveals Plaintiffs' implication of Baton Rouge Refinery operations during the United States' involvement in both World War II (1941-1945) and the Korean War (1950-1953). During these time periods, operations at the Baton Rouge Refinery were directed by the federal government. Plaintiffs' challenge to federally directed and controlled activities gives rise to jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442.[4]

---

[3] *Mumphrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 400 (5th Cir. 2013).
[4] See *Savoie v. Huntington Ingalls, Inc*., 817 F.3d 457, 463 (5th Cir. 2016) ("[R]emoval of the entire case is appropriate so long as a single claim satisfies the federal officer removal statute.") (citing 14C Wright & Miller, Fed. Prac. & Proc. Juris. § 3726 (4th ed.) ("Section 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.")).

"[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum.'"[5] "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint[.]"[6] Put differently, "[u]nlike other defendants, a federal officer can remove a case even if the plaintiff couldn't have filed the case in federal court in the first instance."[7] Additionally, removals under § 1442 are not subject to the well-pleaded complaint rule.[8] To demonstrate the requirements for federal officer removal, ExxonMobil need only show that: (i) ExxonMobil is a "person" as envisioned by the statute; (ii) ExxonMobil acted pursuant to a federal officer's direction; (iii) the charged conduct is connected or associated with an act pursuant to a federal officer's directions; and (iv) ExxonMobil has a colorable federal defense.[9] Here, these requirements are met.

### i. ExxonMobil is a "person" within the meaning of the statute.

A "person" for the purposes of § 1442 includes "corporations, companies, associations, firms, partnerships, societies, joint stock companies, as well as individuals."[10] Under this definition, both Exxon Mobil Corporation and ExxonMobil Pipeline Company, LLC are "persons" for the purposes of § 1442.

### ii. ExxonMobil was acting under the direction of the United States.

The "acting under" prong of federal officer jurisdiction "is 'liberally construed' to cover actions that involve 'an effort to assist, or to help carry out,' the federal supervisor's duties or

---

[5] *Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859 (5th Cir. 2021) (quoting *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 811-12 (3d Cir. 2016)).
[6] *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431, 119 S.Ct. 2069, 2075, 144 L.Ed.2d 408 (1999).
[7] *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006).
[8] *Id*.
[9] *Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th 324, 333 (5th Cir. 2024), *cert. granted sub nom. Chevron USA Inc. v. Plaquemines Par., Louisiana*, 145 S.Ct. 2792 (2025), and *cert. dismissed in part sub nom. Chevron USA Inc. v. Plaquemines Par.*, 145 S.Ct. 2290 (2025).
[10] *Id*. at 812 (looking to the definition of "person" found at § 1 of Title I of the United States Code in the federal officer removal context).

4

tasks."[11] Courts have "explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency."[12] Instead, "it is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between the [defendant] and the [federal officer or agency]."[13] "[T]he 'acting under' inquiry examines the *relationship* between the removing party and the relevant federal officer, requiring courts to determine whether the federal officer exerts a sufficient level of subjection, guidance, or control over the private actor."[14]

WWII was a unique period not only for the United States generally, but particularly for the oil and gas industry. During WWII, "[w]artime exigencies forced strict control of every phase of the industry, and like others the petroleum industry virtually turned over its facilities to the command of the Government."[15] To meet the wartime need for crude oil and refined petroleum products, President Roosevelt issued Executed Order 9276 creating the Petroleum Administration for War ("PAW") to, among other things, issue and take appropriate action to enforce directives to the petroleum industry to "[p]rovide adequate supplies of petroleum for military, or other essential uses[.]"[16] This effort was led by Harold Ickes, the Secretary of the Interior, who wrote at the outset: "I shall want to ask the oil industry to take action in order that costs may be kept down, oil and gas properly conserved, and the producing, transportation, ***refining*** and distributive facilities of the

---

[11] *Papp*, 842 F.3d at 812 (citing *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Phillip Morris Cos.*, 551 U.S. 142, 152 (2007))).

[12] *Papp*, 842 F.3d at 813 (citing *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.36 457, 470 (3d Cir. 2015)).

[13] *Id.* at 812.

[14] *St. Charles Surgical Hosp., L.L.C. v. Louisiana Health Serv. & Indem. Co.*, 990 F.3d 447, 455 (5th Cir. 2021) (emphasis in original) (internal quotation marks and punctuation omitted).

[15] See **Exhibit 2**, The Oil and Gas Journal July 30,1942, at p. 2.

[16] **Exhibit 3**, Executive Order No. 9276 (Issued December 2, 1942), reproduced in A History of the Petroleum Administration for War, 1941-1945, at pp. 375-377; see also **Exhibit 4**, Chronology of War Production Board and Predecessor Agencies, at p. 14.

industry utilized *at maximum efficiency*."[17] Ickes also wrote separately that "the Petroleum Administration exists for the primary purpose of furnishing simple *direction* to the oil industry during the war period[,]" and that "without such a central agency of Government, *guiding* and *coordinating* the efforts of the oil industry, the great task which will continue to face us in oil could not possibly be performed."[18]

To assure oil industry executives, whose assistance was demanded, the Attorney General declared: "In the present emergency acts performed by industry *under the direction of public authority*, and designed to promote public interest and not to achieve private ends, do not constitute violations of the antitrust laws."[19] This assurance was necessary as representatives of the oil and gas industry were appointed to serve on PAW, which "became virtually an operating agency for the petroleum coordinator[.]"[20] The level of control and direction exercised by the federal government was vast, with the federal government assuming the "the very complex duty and important necessity, of encouraging production, refinement, and transportation, and the unusual responsibility, through appropriate Government agencies, of determining the relative needs of the unlimited purposes for which petroleum products were used, and of *allocating the available supplies accordingly*."[21]

PAW played an important role in negotiating contracts with companies that produced petroleum products needed for the war effort, including aviation gasoline ("avgas"). In particular, PAW was authorized to determine "the price and technical details of avgas production and

---

[17] **Exhibit 3**, June 16, 1941 Letter to Attorney General Robert Jackson, reproduced in A History of the Petroleum Administration for War, 1941-1945, at p. 383 (emphasis supplied).
[18] **Exhibit 5**, Fightin' Oil, at p. 81 (emphasis supplied).
[19] **Exhibit 3**, April 29, 1941 Letter from the Attorney General, reproduced in A History of the Petroleum Administration for War, 1941-1945, at pp. 383-384 (emphasis supplied).
[20] See **Exhibit 2**, The Oil and Gas Journal July 30,1942, at p. 2.
[21] **Exhibit 6**, January 2, 1945 Petroleum Investigation – Petroleum Supplies for Military and Civilian Needs, Final Report of the Special Subcommittee on Petroleum Investigation of the Committee on Interstate and Foreign Commerce, United States House of Representatives, at p. 10 (emphasis supplied).

procurement" for the federal government.[22] In the 1942 "Four Party Purchase Agreement," the Defense Supplies Corporation, the U.S. Army, U.S. Navy, and PAW agreed that the Defense Supplies Corporation would act as the *sole* purchaser of avgas from the nation's petroleum industry and would resell it to the United States armed forces as needed.[23] This left refinery owners, such as ExxonMobil's predecessors, "no choice in contracting to make and supply avgas, and little room to maneuver on contract terms[,]" and effectively compelled these refinery owners to enter into supply contracts with the federal government.[24] PAW's control over the oil and gas industry extended to determining how much crude oil production would be utilized for the civilian market and how much would be reserved for the federal government's needs.[25]

ExxonMobil's predecessor, Standard Oil, "fell in line" and signed contracts with the Defense Supplies Corporation to prioritize avgas production at the Baton Rogue Refinery.[26] Under these contracts, the federal government was given control of the type and amount of crude oil sent to the Baton Rouge Refinery.[27] In these contracts, the Defense Supplies Corporation was permitted to require Standard Oil, upon reasonable notice, to modify the specifications for the products it was to receive.[28] Defense Supplies Corporation also had the option to purchase from Standard Oil any avgas that Standard Oil could produce or purchase from its suppliers and which was not already contractually owed to a third party. Upon exercise of that option, Standard Oil was required to operate its facilities at "full capacity or at such lesser capacity" as would satisfy the Defense

---

[22] *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020).
[23] *Id*.
[24] *Id*. at *11-12.
[25] See **Exhibit 7**, Transportation Committee News, Vo. 1, No. 2, November 1944, at p. 2 ("Despite the record crude oil production of nearly 4,750,000 barrels a day, the amount made available by PAW for civilian consumption is 25 percent less than was used in 1941.").
[26] *Id*. at *12.
[27] *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 498 (S.D. Tex. 2015).
[28] See, *e.g.*, **Exhibit 8**, January 13, 1942 Agreement Between Defense Supplies Corporation and Standard Oil Company of New Jersey, 100-Octane Aviation Gasoline, at § II(e).

Supplies Corporations' "need for product," and to use its best efforts to require the same of its suppliers.[29]

Government control during this period was exercised in nearly every area of operations. As set forth in the government report titled "A History of the Petroleum Administration for War":

> "[O]ne of the wartime conditions which served to harass the refiners as much, perhaps, as anything else was the frequent need to change yields so as to produce, at all times, the maximum quantities of most-needed products. One day, refiners would have instructions from PAW to increase their yields of gasoline and cut down their yields of fuel oil. Another occasion, the ever-shifting requirements of war might call for exactly the opposite. And, adding to the difficulty, the orders often had to be dispatched in the form of telegrams, calling for the changes to be made virtually overnight."[30]

Federal control at the Baton Rouge Refinery went even beyond its operation and included the construction of federally owned facilities at the plant. At the Baton Rouge Refinery, the federal government owned six synthetic rubber plants or "Plancors."[31] These Plancors were constructed and operated by Standard Oil Company of Louisiana, but owned by the federal government.[32] PAW additionally authorized the construction of fluid catalytic units at the Baton Rouge Refinery and requested the construction of additional Butyl rubber plants at the Baton Rouge Refinery.[33] Moreover, at the request of the United States Secretary of War, the Baton Rouge Refinery "undertook to develop in a pilot plant a brand new process for making a new 100 octane blending agent."[34]

When the Korean War broke out in 1950, Congress enacted the Defense Production Act ("DPA") which gave the federal government legal authority to force industry to give priority to

---

[29] See, *e.g.*, **Exhibit 8**, January 13, 1942 Agreement Between Defense Supplies Corporation and Standard Oil Company of New Jersey, 100-Octane Aviation Gasoline, at § III.
[30] **Exhibit 3**, A History of the Petroleum Administration for War, 1941-1945, at p. 219.
[31] *Id.* at 501.
[32] *Id.*; see also **Exhibit 9**, 1960 Esso Technical Orientation Program, Brief History of Chemical Products Division.
[33] **Exhibit 10**, January 31, 1944 Memorandum, at pp. 2-4.
[34] **Exhibit 10**, January 31, 1944 Memorandum, at p. 7.

national security production and to seize or requisition facilities and equipment.[35] During the Korean War, the successor of PAW, the Petroleum Administration for Defense ("PAD"), was created, and similarly ordered refineries "to increase their production of wartime materials, including six directives and orders related to the production and use of petroleum products, and four directed to aviation gasoline."[36] "Modeled after the PAW, the PAD had authority to issue orders to private companies to establish programs and policies to operate refineries to ensure sufficient oil production for the war effort."[37]

"A private party working under a federal contract to produce an item the government needed is the archetypal case of a defendant 'acting under' a federal officer."[38] As previously set forth, during the WWII and Korean War eras, ExxonMobil was operating under federal contracts to produce, at its Baton Rouge Refinery, avgas and other products that the United States needed for those war efforts. These federal contracts vested the federal government with control over the size and manufacturing capacity of the Baton Rouge Refinery. Here, during the WWII/Korean War eras, the federal government, through PAW and other officers, was exerting more than a sufficient level of subjection, guidance, and control over ExxonMobil's operations of the Baton Rouge Refinery.

In fact, the United States Fifth Circuit Court of Appeals has already examined the issue of whether such WWII era contracts satisfy the "acting under" requirement for federal officer jurisdiction and found that they do.

---

[35] *Exxon Mobil Corp.*, 108 F. Supp. 3d at 497.
[36] *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048, at *15; see also **Exhibit 12**, December 3, 1953 Report of the National Petroleum Council's Committee on Government Oil and Gas Organization, at p. 5.
[37] *Exxon Mobil Corp.*, 108 F. Supp. 3d at 497.
[38] *Plaquemines Par.*, 103 F.4th at 334.

In *Plaquemines Parish v. BP America Production Company*, the United States Fifth Circuit Court of Appeals addressed an appeal from a district court remand order.[39] In the *Plaquemines Parish* case, a number of coastal Louisiana Parishes sued various oil companies in state court in relation to oil and gas exploration, production, and transportation operations conducted on the Louisiana coast.[40] Pertinent to the instant Removal Notice, the defendants in the *Plaquemines Parish* case removed the matter to federal court on the basis of federal officer jurisdiction owing to the WWII-era contracts between the federal government and the oil companies regarding the refining of petroleum products (including avgas) for the war effort.[41] On motion by the plaintiffs, the district court ordered the case to be remanded upon its finding that: (i) these WWII-era contracts did not satisfy the "acting under" requirement for federal officer jurisdiction because they pertained to refinery activities and did not relate to the production activities at issue in the lawsuit; and (ii) the charged conduct was not connected to or associated with an act pursuant to a federal officer's directions.[42]

On appeal, the Fifth Circuit ultimately affirmed the district court's remand order upon its finding that the fourth factor for federal officer jurisdiction, the "connected or associated with" factor, was not satisfied.[43] ***However***, the Fifth Circuit determined that the district court had erred in its determination that the "acting under" requirement was not satisfied.[44] The Fifth Circuit found that the defendants were, during the WWII-era, working under federal contracts to produce avgas, which contracts vested the federal government with control over the size and manufacturing

---

[39] Plaquemines Par. v. BP America Prod. Co., 103 F.4th 324 (5th Cir. 2024).

[40] *Id*. at 329.

[41] *Id*. at 331-32.

[42] *Id*. at 332.

[43] *Id*. at 345. The United States Supreme Court has granted the *Plaquemines Parish* defendants' writ of certiorari challenging this determination by the Fifth Circuit. *Chevron USA, Inc., et al. v. Plaquemines Par., Louisiana, et al.*, 145 S.Ct. 2792 (2025).

[44] *Plaquemines Par.*, 103 F.4th at 334.

capacity of the defendants' refineries.[45] The Fifth Circuit found that the District Court erred in finding that the "acting under" requirement was not met, and that the District Court had impermissibly required a showing that the defendant acted "pursuant to federal directives when they engaged in the conduct giving rise to Plaintiffs' suit" because this analysis conflates the second and third prongs of federal officer jurisdiction.[46] The Court reiterated that "a defendant might be 'acting under' a federal officer while at the same time the specific conduct at issue may not be connected or associated with an act pursuant to the federal officer's direction."[47]

Here, these same sorts of contracts are at issue and the "acting under" requirement for federal officer jurisdiction is, therefore, satisfied.

### iii.   The charged conduct is related to the federal direction.

For federal officer removal, defendants must have "acted under" a federal officer and those acts must also be related to, *i.e.*, "connected to or associated with", the activities challenged in the complaint.[48] Here, these requirements are satisfied because Plaintiffs challenge operations of the Melville Pumping Station and related pipeline which they allege are "***inseparable***" from operations at the Baton Rouge Refinery. The Bost Report makes clear that Plaintiffs view the Melville Pumping Station and related pipeline as merely an "arm" of the Baton Rouge Refinery. With the Bost Report, Plaintiffs have now revealed that they are alleging that the Melville Pumping Station and pipeline are a ***part of*** the Baton Rouge Refinery. Accordingly, Plaintiffs are, in actual fact, challenging operations at the Baton Rouge Refinery, including those operations that were occurring during the time-periods when the Baton Rouge Refinery was being operated under

---

[45] *Id*. at 335. A similar conclusion was reached by the United States District Court for the Eastern District of Texas in *Reed v. Fina Oil & Chemical Co.*, 995 F. Supp. 705 (E.D. Tex. 1998), in relation to a different facility in Texas
[46] *Plaquemines Parish*, 103 F.4th at 335.
[47] *Id*. (quoting *St. Charles Surgical Hosp., LLC v. La. Health Serv. & Indem. Co.*, 990 F.3d 447, 454 (5th Cir. 2021)).
[48] *Id*.

federal contracts that vested the federal government with significant control over the operations of the Baton Rouge Refinery. As such, the conduct challenged by the Plaintiffs is inarguably "connected to or associated with" the operations of ExxonMobil while "acting under" the direction of federal officers.

Here, there is no disconnect or separation between the conduct challenged by Plaintiffs and the federal contracts related to refining, as it is these very activities which Plaintiffs now reveal themselves to be challenging. Again, Plaintiffs are asserting that the Melville Pumping Station and pipeline are a part of or are an "arm" of the Baton Rouge Refinery and that their operations are "inseparable" from the operations of the Baton Rouge Refinery. During WWII (and to a lesser extent during the Korean War), the Baton Rouge Refinery was virtually under the control of the federal government and was operating to satisfy government contracts for the production of petroleum products including avgas. Accordingly, during these time periods, the Baton Rouge Refinery was "acting under" the direction of federal officers. Plaintiffs allege that the pipeline and the Melville Pumping Station, during its operating life of 1912 to 1952 (which includes both WWII and the Korean War) were "arms" of the Baton Rouge Refinery that were feeding the Baton Rouge Refinery crude oil as part of its operations, and that these operations caused damage to the Plaintiffs' property and their alleged exposure to hazardous substances. When Bost makes reference in his report to "expanded production" at the Baton Rouge Refinery and how it allegedly drove/informed operations at the Melville Pumping Station and trunkline, he is referring in no small part to the expanded production during these times of war, when the expanded production at the Baton Rouge Refinery was occurring at the direction and behest of the federal government.[49]

---

[49] **Exhibit 1**, Bost Report, at p. 30.

To be sure, ExxonMobil is not attempting to draw a line of connectivity between the operations at the Melville Pumping Station and the Baton Rouge Refinery, it is *Plaintiffs* who draw this connection as they now allege that the complained of conduct is connected to these federally directed and controlled operations.

Given these new allegations, it is inarguable that the conduct challenged by Plaintiffs is related to the operations at the Baton Rouge Refinery which were performed at the direction of the federal government.

Accordingly, this requirement for federal officer jurisdiction is satisfied as well.

### iv.   ExxonMobil has a colorable federal defense.

In order to satisfy the "colorable federal defense" requirement, the asserted federal defense does not need to be clearly sustainable, as § 1442 does not require a federal official or person acting under him to win the case before removal.[50] The asserted federal defense is "colorable" so long as it is not immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous.[51] "[I]f a defense is plausible, it is colorable."[52]

Here, ExxonMobil has a colorable federal defense, namely the federal contractor defense (*i.e.*, derivative federal immunity).  "The concept of derivative immunity extends to private contractors the immunity traditionally afforded to the government when the contractor (1) acts under the federal government's authority and direction and (2) does not exceed the authority conferred by the federal government."[53] ExxonMobil is entitled to derivative federal immunity because the actions (operations at the Baton Rouge Refinery) causing the alleged harm (the alleged contamination of the property and alleged exposure of the Plaintiffs) were taken pursuant to

---

[50] *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020).
[51] *Id*. at 297.
[52] *Id*.
[53] *Cantu v. Orion Marine Grp., LLC*, 510 F. Supp. 3d 453, 464 (S.D. Tex. 2020).

contracts with the federal government (the WWII/Korean War era contracts) for the purpose of furthering federal projects (the production of avgas and other petroleum products for the war effort).[54]

Additionally and/or alternatively, ExxonMobil has a colorable federal defense to Plaintiffs' claims based on its compliance with federal law, namely the directives issued by the federal government during WWII/the Korean War regarding operations at the Baton Rouge Refinery.[55] "Typically, it is sufficient for defendants to establish a colorable federal defense by stating that they 'complied with all his federal law obligations.'"[56] Here, ExxonMobil operated the Baton Rouge Refinery during the applicable time period in compliance with these federal orders and directives, and it is precisely these operations that Plaintiffs allege are the genesis of the damages they allegedly suffered.

Accordingly, with at least two colorable federal defenses to the Plaintiffs' claims, this requirement for federal officer removal is satisfied as well.

With all requirements for federal officer removal being satisfied, ExxonMobil is entitled to the removal of this action under § 1442.

### b. Removal is timely because ExxonMobil filed this Notice of Removal within 30 days of receiving the Bost Report.

There are two deadlines for filing a notice of removal. First, a notice of removal must be filed "within 30 days after the receipt by the defendant … of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."[57] This deadline only

---

[54] See *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 206-07 (5th Cir. 2009).
[55] See *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 139 (2d Cir. 2008) ("Compliance with federal law, therefore, provides a colorable defense under some circumstances, but it is not coterminous with an immunity defense).
[56] *W. Virginia State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 312 n.6 (4th Cir. 2022) (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996)).
[57] 28 U.S.C. § 1446(b)(1).

applies where the initial pleading "revealed on its face" the basis for federal jurisdiction.[58] If the basis for federal jurisdiction is not evident from the face of the initial pleading, a defendant may remove a case "within thirty days after receipt by the defendant, through service or otherwise, of a copy of an … other paper from which it may first be ascertained that the case is one which is or has become removable."[59] Expert reports may serve as any "other paper" providing a basis for the removal of an action.[60]

### i. The existence of Federal Officer jurisdiction was not evident on the face of Plaintiffs initial pleadings.

The Fifth Circuit applies a "bright line" rule to determine if removal is timely, requiring "the plaintiff, if he wishes the thirty-day time period to run from the defendant's receipt of the initial pleading, to place in the initial pleading a specific allegation" that unambiguously reveals the nature of the claims asserted.[61] The Fifth Circuit adopted this rule as "it promotes certainty and judicial efficiency by not requiring courts to inquire into what a particular defendant may or may not have subjectively known."[62]

Here, instead of unambiguously revealing the nature of the claims Plaintiffs are asserting against ExxonMobil, Plaintiffs instead failed to allege in their Petition, despite multiple amendments, that their claims were connected to and allegedly "inseparable" from operations at ExxonMobil's Baton Rouge Refinery. In fact, despite multiple amendments, Plaintiffs failed to make any allegation whatsoever about the Baton Rouge Refinery in their Petition. It was only upon

---

[58] *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994).
[59] 28 U.S.C. § 1446(b)(3).
[60] *Par. of Plaquemines v. Chevron USA, Inc.*, 7 F.4th 362, 373 (5th Cir. 2021) (removal was timely as expert report from plaintiffs was "other paper"); *Fink v. Regis Corp.*, No. CIV.A. 11-01873, 2012 WL 601449, at *5 (W.D. La. Feb. 22, 2012) (finding that expert report was an "other paper"); *Nicole v. Sch. Dist. of Philadelphia*, No. 16-CV-1457, 2016 WL 3456924, at *3 (E.D. Pa. June 20, 2016) (same); *Gibson v. Clean Harbors Env't Servs., Inc.*, 840 F.3d 515, 522 (8th Cir. 2016) (holding that expert report and affidavit was "other paper" for removal purposes).
[61] *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 (5th Cir. 1992).
[62] *Id*.

ExxonMobil's receipt of the Bost Report that ExxonMobil became aware that Plaintiffs were alleging that the Melville Pumping Station and trunkline were operating as an "arm" of the Baton Rouge Refinery and that these operations were "inseparable" from operations at the Baton Rouge Refinery.

Plaintiffs initially filed this lawsuit on or about September 5, 2014, in the 19th Judicial District Court, East Baton Rouge Parish, Louisiana. The Plaintiffs are a group of residents of and neighbors to the Standard Heights Subdivision in Melville, St. Landry Parish, Louisiana, who assert claims for personal injuries and property damage allegedly connected to ExxonMobil's historical operations of a crude oil pumping station on the property that would become the subdivision in the early 20th century.

Plaintiffs' Petition, as amended, alleges that the operation of the Melville Pumping Station and trunkline by Standard Oil Company of Louisiana (from approximately 1910 to 1944) and Interstate Oil Company (from approximately 1944 to 1952) resulted in the alleged contamination of their property and their alleged exposure.[63] Plaintiffs allege in their Petition that Standard Oil Company of Louisiana is the predecessor in interest to EMC and that Interstate Oil Pipe Line Company is the predecessor in interest to EMPC, and that EMC and EMPC "are liable as successors in interest for contamination caused by Interstate Oil Pipe Line Co. and Standard Oil of Louisiana."[64]

Plaintiffs' initial Petition makes no reference to the Baton Rouge Refinery or any refinery operations. Plaintiffs' First Supplemental and Amending Petition for Damages also makes no reference to the Baton Rouge Refinery or refinery operations. Plaintiffs' Second Supplemental and

---

[63] **Exhibit 13-A**, at pp. 8-14, Petition, at § III, ¶¶ 1-16. In the initial Petition the number of the paragraphs restarts in some sections thereof necessitating a reference to both the section and paragraph of the Petition being referenced.
[64] **Exhibit 13-A**, at p. 9, Petition, at § III, ¶ 5.

Amending Petition makes no reference to the Baton Rouge Refinery and makes only oblique and secondary reference to refinery operations.[65] Plaintiffs' Third Supplemental and Amending Petition for Damages and Fourth Supplemental and Amending Petition for Damages also make no reference to the Baton Rouge Refinery or refinery operations. In fact, in their initial Petition, Plaintiffs identify the Melville Pumping Station as having "supported the Interstate trunkline system of pipeline that transported crude oil from various points in Oklahoma, Arkansas and Louisiana to the Gulf of Mexico[,]" making no reference to its termination at the Anchorage terminal or any role it played in operations at the Baton Rouge Refinery.[66] In their Second Supplemental and Amending Petition, Plaintiffs corrected this allegation to allege that trunkline terminated at the Anchorage terminal, but, again, made no reference to the Baton Rouge refinery.[67]

From the institution of the lawsuit until the production of the Bost Report, Plaintiffs have framed their claims in this lawsuit as claims arising from the alleged contamination of their property from the operation of the Melville Pumping Station and trunkline and have asserted that EMC and EMPC are liable to them as a result of EMC and EMPC being the successor in interest to the prior owners/operators of the Melville Pumping Station and trunkline. They have asserted this liability based upon the alleged acts and omissions of EMC's and EMPC's predecessors as operators of the Melville Pumping Station and trunkline, namely the alleged failure of EMC's and EMPC's predecessors to clean up the property and warn subsequent purchasers of the contamination.

---

[65] See **Exhibit 13-A**, at pp. 267-286, Second Supplemental and Amending Petition, at ¶ 19 ("Crude oil tank bottoms or tank sludge are comprised of water and suspended solids that settle out of crude oil and collect at the bottom of crude oil storage tanks before the crude oil reaches the refinery. Crude oil tank bottoms are a discarded and contaminated waste product not subject to the refining process and not used to produce any useful product."), at ¶ 58 (referencing a publication from the Baytown, Texas refinery), at ¶ 100(f) (citing a 2004 academic paper regarding mortality study of refinery workers).

[66] **Exhibit 13-A**, at pp. 9-10, Petition, at § III, ¶ 6.

[67] **Exhibit 13-A**, at p. 265, Second Supplemental and Amending Petition, at ¶ 12.

With the Bost Report, Plaintiffs are asserting for the first time that acts and/or admissions by the prior operator of the Baton Rogue Refinery are also implicated, greatly expanding their claims and revealing for the first time to ExxonMobil the implication of Baton Rouge Refinery operations and ExxonMobil's grounds for federal officer jurisdiction removal. Given the fact that the allegations of the Petition, as amended, were focused solely on operations at the Melville Pumping Station, and made no reference to operations at the Baton Rouge Refinery, ExxonMobil did not know and had no way of knowing prior to the production of the Bost Report that (i) operations at the Baton Rouge Refinery were implicated in the Plaintiffs' claims and (ii) that it had grounds for removal based upon federal officer jurisdiction.

### ii. The Bost Report constitutes "other paper" from which ExxonMobil could first ascertain that this case became removable under 28 U.S.C. § 1442.

This case became removable on September 29, 2025 when Plaintiffs produced the Bost Report which revealed, for the first time, that Plaintiffs' claims implicate federal officer jurisdiction.

The Bost Report makes numerous statements regarding the Baton Rouge Refinery and its operations and linking these operations to the Melville Pumping Station and, thereby, the Plaintiffs' property. The Bost Report in fact includes a subsection entitled "Exxon's Line Pipe/Trunklines and Pumping Stations Operated as an Arm of its Refinery."[68] The Bost Report affirmatively asserts that "Exxon's 8-inch line pipe/trunklines constructed in 1909, and the Melville Pumping Station constructed in 1912, were built and operated as an arm of Exxon's Baton Rouge Refinery operations."[69] In support of this opinion, the Bost Report cites to a number of historical documents from as early as 1916 to as late as 1951, including the 1942 digest of the Petroleum-Industry

---

[68] **Exhibit 1**, Bost Report, at pp. 29-30
[69] **Exhibit 1**, Bost Report, at pp. 29-30

Hearings Before the Temporary National Economic Committee.[70] In this subsection the Bost Report asserts that:

- "Exxon's line pipe/trunkline and pumping station expansions and operations throughout Louisiana were driven by Exxon's desires to expand production at its Baton Rouge Refinery . . ."[71]

- "Exxon's line pipe/trunklines and its Baton Rouge Refinery are therefore **inseparable**, because each line/pipe trunkline (sic) expansion was a direct result of the Baton Rouge Refinery requiring an increasing supply of crude oil."[72]

The Bost Report goes further to allege that ". . . Exxon maintained that its Louisiana trunklines were simply a plant facility operated for the Baton Rouge Refinery's exclusive use . . ."[73]

The Bost Report demonstrates that Plaintiffs are now alleging that the operations at the Melville Pumping Station and trunkline which allegedly contaminated their property and exposed them to contamination are linked to the operations of the Baton Rouge Refinery, as their expert asserts that the Melville Pumping Station and the pipelines it serviced were "arms" of the Baton Rouge Refinery and that the operations of the Melville Pumping Station and these pipelines are "inseparable" from the operations at the Baton Rouge Refinery.

Plaintiffs' aims in this regard are made clear in the Bost Report, but this is not the only newly produced indication of what they are attempting to do. Simultaneously with the Bost Report, Plaintiffs also produced the report of Jeffrey E. Meyers and Harold Asher (the "Meyers/Asher Report"), which offers opinions regarding "select aspects of the operations of" Standard Oil

---

[70] **Exhibit 1**, Bost Report, at p. 30.
[71] **Exhibit 1**, Bost Report, at p. 30.
[72] **Exhibit 1**, Bost Report, at p. 30 (emphasis supplied).
[73] **Exhibit 1**, Bost Report, at p. 33.

Company of Louisiana and Interstate Oil Pipeline.[74] The Meyers/Asher Report repeatedly conflates and/or draw connections between operations at the Melville Pumping Station and the Baton Rouge Refinery:

- ". . . SONJ [Standard Oil of New Jersey] effectively controlled Interstate operations."[75]

- "SONJ [Standard Oil of New Jersey] was Interstate's principal (if not sole) source of revenues and profits."[76]

- "Interstate served SONJ [Standard Oil of New Jersey] as a captive pipeline system for SONJ's oil production that was transported to the Baton Rouge refinery for processing and sale."[77]

- In reference to the 1951 modernization program which ultimately resulted in the decommissioning of the Melville Pumping Station and the old trunkline: "Interstate made these changes to increase the efficiency and economy of operations and to satisfy the Baton Rouge refinery's growing crude requirements."[78]

Both the Bost Report and the Meyers/Asher Report tie in the operations of the Melville Pumping Station and trunkline with operations at the Baton Rouge Refinery. They conflate and blur the line between these different operational spheres during both periods when the Melville Pumping Station and trunkline were owned/operated by Standard Oil Company of Louisiana and when they were operated by Interstate Oil Pipeline Company.

This is important because Standard Oil Company of Louisiana's ownership/operation overlaps with the United States' involvement in WWII (1941-1944), and the period of Interstate

---

[74] **Exhibit 11**, Meyers/Asher Report.
[75] **Exhibit 11**, Meyers/Asher Report, at p. 6.
[76] **Exhibit 11**, Meyers/Asher Report, at p. 6.
[77] **Exhibit 11**, Meyers/Asher Report, at p. 6.
[78] **Exhibit 11**, Meyers/Asher Report, p. 4.

Oil Pipeline Company's ownership/operation overlaps with both the United States' involvement in WWII (1944-1945) and the Korean War (1950-1953). Again, the federal government exerted significant control and direction over the operation of the Baton Rouge Refinery during both conflicts. By implicating Baton Rouge Refinery operations during these time periods as being "inseparable" from the operations which allegedly give rise to their causes of actions and alleged damages, Plaintiffs have now, for the first time, revealed the true, full nature of their claims and ExxonMobil's grounds for removal based on federal officer jurisdiction.

ExxonMobil could not have ascertained that this case was removable based on federal officer jurisdiction from Plaintiffs' Petition, as amended, which makes no mention of Baton Rouge Refinery operations. It was only when the Bost Report was received, and Baton Rouge Refinery operations during the operative time periods were implicated, that ExxonMobil could first ascertain that all of the necessary requirements for removal based on federal officer jurisdiction were present and the case was removable.[79] Here, the Plaintiffs' Petition, as amended, which makes no reference to Baton Rouge Refinery operations, cannot be said to have been sufficiently definite on its face to enable ExxonMobil to "ascertain removability without reliance on speculation or conjecture."[80]

Further, Interstate Oil Pipe Line Company (which owned/operated the Melville Pumping Station and trunkline from 1944-1953) is a separate entity which the Plaintiffs are now alleging was acting under the direction of the Baton Rouge Refinery (owned at the time by Standard Oil Company of Louisiana). ExxonMobil had *absolutely* no way of ascertaining that Baton Rouge

---

[79] See *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 605 (5th Cir. 2018) (holding that deposition transcript that revealed for the first time that plaintiff had worked on a U.S Navy ship while employed with defendant constituted "other paper" for removal purposes).

[80] *Evett v. Consol. Freightways Corp.*, 110 F. Supp. 2d 510, 513 (E.D. Tex. 2000) (citing *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 165 (5th Cir. 1992)).

Refinery operations during the Interstate Pipe Oil Line era would be implicated until it received the Bost Report.

Accordingly, with this Notice of Removal being filed within 30 days of ExxonMobil's receipt of the Bost Report on September 29, 2025, this removal is timely.[81]

### c. Removal is procedurally proper

**Venue is proper.** The 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana is located within the United States District Court for the Middle District of Louisiana. Removal to this Court therefore satisfies the venue requirements of 28 U.S.C. § 1446(a) and 28 U.S.C. § 98(c).

**Co-defendant consent is not required.** In addition to ExxonMobil, Plaintiffs initially named as parties defendant in this action two individuals, Kenneth Curtis and Morgan J. Godeau, III (the "Other Defendants"). The claims against Morgan J. Goudeau, III were dismissed with prejudice by order dated December 4, 2014. The claims against Kenneth V. Curtis were dismissed with prejudice on October 18, 2016. The consent of the Other Defendants is not required as: (i) the Other Defendants have been dismissed from the state court action; and (ii) the consent of co-defendants is not required for removal under § 1442.[82]

**State court record**. ExxonMobil attached as **Exhibits 13-A**, **13-B**, **13-C**, **13-D**, **13-E**, **13-F**, **13-G**, **13-H**, **13-I**, **13-J**, **13-K**, and **13-L** a copy of all process, pleadings, and orders served on it as of the date of this filing in compliance with § 1446(a). **Exhibit 13-L** includes a printed copy

---

[81] See *Par. of Plaquemines*, 7 F.4th at 374.

[82] *Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, a federal officer or agency defendant can unilaterally remove a case under section 1442.") (internal citations omitted); *Citrano v. John Crane-Houdaille, Inc.*, 1 F. Supp. 3d 459, 465 (D. Md. 2014) ("Unlike removal under § 1441, under § 1442(a) the other defendants need not join in or consent for removal to be proper.").

of the state court docket sheet.[83] A certification by counsel that **Exhibits 13-A** through **13-L** constitute the entire State Court Record is attached as **Exhibit 15**.

      **Notice to State Court.** ExxonMobil will promptly file written notice of this removal in the 19th Judicial District Court for East Baton Rouge Parish, State of Louisiana, and serve Plaintiffs.

      **Jury Trial.** ExxonMobil invokes its right to a trial by jury guaranteed by the Seventh Amendment to the United States Constitution on all issues so triable.

      ExxonMobil does not waive any legal defenses and expressly reserves its right to raise all legal defenses in these proceedings.

## IV.    <u>CONCLUSION</u>

      For the above and foregoing reasons, ExxonMobil's Notice of Removal is timely and well-founded. ExxonMobil hereby removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1442, and all other applicable laws and rules.

Respectfully submitted,

**BIENVENU, FOCO & VIATOR, LLC**

By: _____

    Phillip E. Foco, #25670
    John Allain Viator, #25915
    David M. Bienvenu, #20700
    F. Charles Marionneaux, #18320
    Colin P. O'Rourke, #37252
    M. Jade Avant, #37867
    Henry Rauschenberger, #37834
    4210 Bluebonnet Boulevard
    Baton Rouge, LA 70809
    Telephone (225) 388-5600
    Telecopier (225) 388-5622
    E-Mail: phillip.foco@bblawla.com
          john.viator@bblawla.com
          david.bienvenu@bblawla.com

---

[83] Additionally, a list of the documents included in the state court record, arranged by filing date, has been attached as **Exhibit 14**, and a list of all attorneys involved in this case and the parties they represent has been attached as **Exhibit 16**.

chip.marionneaux@bblawla.com
colin.orourke@bblawla.com
jade.avant@bblawla.com
henry.rauschenberger@bblawla.com

*Attorneys for Exxon Mobil Corporation and
ExxonMobil Pipeline Company, LLC*

## CERTIFICATE OF SERVICE

**I CERTIFY** that on October 17, 2025, a copy of the foregoing "*Notice of Removal*" was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all CM/ECF participants by operation of the Court's electronic filing system and to counsel for all parties by both United States Mail, postage prepaid and properly addressed and electronic mail.

_____
John Allain Viator